**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**KATHY KINNIN,**

                         **Plaintiff,**

          **v.**

**SKIDMORE COLLEGE,**

                     **Defendant.**

**1:19-cv-629**
**(GLS/TWD)**

_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PLAINTIFF:** | |
| Cooper, Erving & Savage, LLP | PHILIP G. STECK, ESQ. |
| 39 North Pearl Street | |
| 4th Floor | |
| Albany, NY 12207 | |
| | |
| **FOR THE DEFENDANT:** | |
| Bond, Schoeneck & King, PLLC | MICHAEL D. BILLOK, ESQ. |
| 268 Broadway | ERIC M. O'BRIEN, ESQ. |
| Suite 104 | |
| Saratoga Springs, NY 12866 | |
| | |
| 22 Corporate Woods Blvd, Suite 501 | |
| Albany, NY 12211 | |

**Gary L. Sharpe**
**Senior District Judge**

**MEMORANDUM-DECISION AND ORDER**

**I. Introduction**

Plaintiff Kathy Kinnin commenced this action against defendant Skidmore College, alleging employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964.[1]  (Compl., Dkt. No. 1.) Now pending are Skidmore's motion for summary judgment, (Dkt. No. 41), and to preclude expert testimony, (Dkt. No. 42).  For the reasons that follow, Skidmore's motion for summary judgment is granted[2] and its motion to preclude expert testimony is denied as moot.[3]

_____

[1]  *See* 42 U.S.C. §§ 2000e-2000e-17.

[2]  Kinnin also brought a Title IX nepotism claim, however, she did not respond to Skidmore's arguments for summary judgment on this claim (Dkt. No. 45.)  "When a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a 'modest' burden."  *Rehkugler v. Aetna Life Ins. Co.*, No. 516-CV-0024, 2017 WL 3016835, at *13 (N.D.N.Y. July 14, 2017) (citing N.D.N.Y. L.R. 7.1(b)(3) (other citations omitted)).  While Skidmore's contention that summary judgment should be granted because there is no private right of action for gender discrimination under Title IX no longer has merit, *see Vengalatorre v. Cornell University*, 36 F.4th 87, 106 (2d. Cir. 2022), Skidmore's alternative argument regarding the absence of a viable nepotism claim under Title IX has facial merit. (Dkt. No. 41, Attach. 5, at 30-32.)  Thus, Skidmore has met its lightened burden and Skidmore's motion for summary judgment with respect Kinnin's nepotism claim is granted.

[3]  Because Skidmore's motion for summary judgment has been granted on all claims, Skidmore's motion to preclude Kinnin's expert testimony and expert report, (Dkt. No. 42), is denied as moot.  *See Kandt v. Taser Intern., Inc.*, No. 5:09-CV-0507, 2012 WL 2861583, at * 5 (N.D.N.Y. Jul. 10, 2012) (denying motions to preclude expert testimony as moot after granting summary judgment on all claims.)

## II.  Background

**A.   Facts**[4]

Skidmore is a private college in Saratoga Springs, New York.  (Def.'s Statement of Material Facts (SMF) ¶ 1, Dkt. No. 41, Attach. 1.)  Kinnin was an employee in Skidmore's Information Technology (IT) Department from 2010 until her termination in 2018.  (*Id.* ¶ 2.)  When Kinnin was first hired as a Mac computer technician, her direct supervisor was Tom Marcotte, Director of User Services.  (*Id.* ¶¶ 3, 5.)  In 2014, Marcotte was promoted from Director of User Services to Director of IT Planning and Strategic Communications and Kinnin replaced him as Director of User Services. (*Id.* ¶ 6.)  In her new position, Kinnin reported to Chief Technology Officer William Duffy, and no longer reported to Marcotte.  (*Id.*)

After Kinnin's promotion, problems arose between Kinnin and two different employees: Chris Bailey and Leon Briggs.  Bailey was hired in September 2014 as a media technician.  (*Id.* ¶ 23.)  Kinnin complained about Bailey to Duffy in February 2015, citing, among other things, his

---

[4]  Because Kinnin disputes portions of various paragraphs in Skidmore's statement of material facts, to the extent the court cites to one of these paragraphs, it is citing to an undisputed portion thereof.

aggressive behavior and an instance where Bailey grabbed Kinnin by the arm "as if to guide [her]." (*Id.* ¶¶ 24-25; Dkt. No. 45, Attach. 4; Dkt. No. 45, Attach 5.)  Kinnin continued to communicate her problems with Bailey to Duffy, who encouraged Kinnin to speak with Skidmore's Human Resources (HR) Department. (Def.'s SMF ¶ 26.)  Kinnin met with a representative from HR in August 2015 and again in October 2015 about her complaints regarding Bailey's behavior. (*Id.* ¶¶ 26, 29.)  Duffy and Barbra Beck from HR informed Kinnin that Duffy was meeting with Bailey every two to three weeks to address his behavior, however, Kinnin asserts that no more than one of these meetings between Duffy and Bailey occurred. (*Id.* ¶¶ 28-29; Pl.'s SMF ¶¶ 28-29.)  Bailey resigned on November 11, 2015, after it was discovered that he had falsified travel reimbursements. (Def.'s SMF ¶ 34.)

After Kinnin's promotion to director, Skidmore had an opening for a Mac technician. (*Id.* ¶ 16.)  Marcotte recommended his friend, Briggs, for the position. (*Id.*)  Briggs was hired even though he did not have experience working with Mac computers. (*Id.* ¶¶ 16-17.)  Kinnin was Briggs' supervisor. (Dkt. No. 45, Attach. 14 ¶¶ 13-14.)  Kinnin and Briggs often "butted heads" and Kinnin described having "great difficulty with Briggs as an employee" and believed that Briggs could not overcome his

lack of Mac experience.  (Def.'s SMF ¶ 19; Dkt. No. 45, Attach. 14 ¶ 13.)

In 2017, Kinnin was planning to give Briggs a "needs improvement"

performance evaluation, which would have resulted in Briggs not receiving

a raise, however, Duffy changed Briggs' evaluation to satisfactory.  (Def.'s

SMF ¶¶ 20-21.)  Skidmore's reasoning for Duffy overriding Kinnin's review

was that the college wanted to limit the amount of "needs improvement"

evaluations across campus.  (*Id.* ¶¶ 21-22.)

From 2015 to 2018, Kinnin made numerous complaints about

Marcotte and the way the IT Department way being run, which she

communicated to Duffy, the HR department, and other senior staff.  (Dkt.

No. 41, Attach. 4, at 854-58, 871-82.[5])  In an e-mail to Duffy in June 2017,

Kinnin claimed Marcotte's conduct was harassment.  (Dkt. No. 45, Attach.

15 at 135-36.)  Duffy shared this e-mail with Marcotte, who disputed these

allegations  (*Id.*)  Marcotte then suggested to Duffy that Kinnin should be

investigated for performing unauthorized tasks, and provided Duffy with a

list of critiques to include in Kinnin's 2018 performance evaluation.  (*Id.* at

132-34.)

---

[5]   Where page numbers are generated by CM/ECF, the Court's electronic filing
system, citations to filings refer to these generated page numbers.

At some point while working under Kinnin, Briggs told another IT employee, Christopher Breslin, that he was trying to get Kinnin fired.  (Dkt. No. 45, Attach. 30, at 15.)  Briggs and Marcotte frequently met in Marcotte's office during the workday with the door closed.  (Dkt. No. 45, Attach. 27 at 36-37; Dkt. No. 45, Attach. 36 at 28.)  In spring 2018, Kinnin observed that Briggs was not performing tasks as she instructed him, which caused Kinnin to believe that Briggs was conspiring with Marcotte "to make it seem like [Kinnin] was not managing [Briggs] properly" by having Briggs intentionally sabotage his work.  (Def.'s SMF ¶¶ 126-27.)  While Kinnin never heard any conversation or saw any document to suggest Marcotte and Briggs had done so, she believed they were conspiring against her because of their frequent meetings behind closed doors.  (*Id.* ¶ 128.)

Briggs met with Gretchen Steffan in the HR Department in March 2018, where they discussed Kinnin's treatment of Briggs.  (Def.'s SMF   ¶ 92.)  On May 15, 2018, Steffan drafted a complaint alleging race discrimination on behalf of Briggs against Kinnin.  (*Id.*)  Skidmore hired a third-party investigator, Diane Pfadenhauer, a fifteen-year human resources professional, to handle Briggs' complaint.  (*Id.* ¶¶ 93-95.)  Kinnin

6

filed a formal written complaint alleging gender discrimination by Marcotte on May 30, 2018.  (*Id.* ¶ 98.)  Skidmore directed Pfadenhauer to investigate Kinnin's complaint in addition to Briggs' complaint.  (*Id.* ¶ 97.)  Pfadenahuer interviewed twenty-six people and reviewed over 200 documents sent by Kinnin as a part of her investigation.  (*Id.* ¶ 104.)  At the conclusion of the investigation, Pfadenhauer issued a report with her findings.  (*Id.* ¶ 107.)  Pfadenhauer determined that whether Kinnin's treatment of Briggs was race-based was inconclusive, but found that Kinnin "has a history of subjecting certain . . . employees to her wrath for unknown reasons.  This wrath includes painstaking micromanagement, intense criticism of work and tasks, assignment of menial responsibilities, etc., until the individual either resigns or is terminated."  (Dkt. No. 47, Attach. 2 at 5-6.)  Pfadenhauer also concluded that Kinnin had not been subjected to gender discrimination.  (Def.'s SMF ¶ 110; Dkt. No. 47, Attach. 2 at 24.)  Based on the report, Michael West, Skidmore's Vice President of Finance, decided to terminate Kinnin's employment on the basis of poor performance and poor management skills.  (Def.'s SMF    ¶ 112.)

        In her formal written complaint, Kinnin alleged that she was subjected

to harassment, a hostile work environment, and misogyny at the hands of Marcotte, and that Duffy "supprt[ed] and encourag[ed] [Marcotte's] behavior by not addressing it directly." (Dkt. No. 41, Attach. 4 at 854.) Additionally, Kinnin complained about the reporting process at Skidmore, because her complaints of harassment were not seriously investigated, the HR department and her supervisors were not always responsive to her complaints, and information she reported was not kept confidential, referring to the system as "extremely flawed." (*Id.* at 854-58.) Kinnin also claimed that Briggs' complaint against her was "retaliatory" and "additional harassment orchestrated by . . . Marcotte." (*Id.* at 858.)

B.  **Procedural History**

Kinnin filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC). (Def.'s SMF ¶ 116.) The EEOC dismissed Kinnin's charge without investigation and issued a notice of the right to sue. (*Id.* ¶ 117.) Kinnin thereafter commenced this action. (Compl., Dkt. No. 1.) Skidmore now seeks summary judgment on all of Kinnin's claims and has moved to preclude the expert testimony and report of Kinnin's expert witness. (Dkt. Nos. 41, 42.)

### III.  **Standard of Review**

The standard of review under Fed. R. Civ. P. 56 is well settled and will not be repeated here.  For a full discussion of the governing standard, the court refers the parties to its prior decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

### IV.  **Discussion**

### A.  **Title VII Discrimination**

Skidmore argues that Kinnin has failed to demonstrate that she was discriminated against.  (Dkt.   No. 41, Attach. 5, at 25-27.)  Skidmore also asserts the Kinnin was fired for a legitimate non-discriminatory reason and that she is unable to demonstrate pretext.  (*Id.* at 29.)  Kinnin asserts that she has established a prima facie case under Title VII because Skidmore "consistently defend[s] the unacceptable behavior of its male employees . . . rather than . . .  supporting its [female] manager."  (Dkt. No. 45 at 25-29.)  Specifically, Kinnin contends that she was treated less favorably than other male employees in the IT Department and that Marcotte was given preferential treatment throughout Pfadenhauer's investigation.  (*Id.* at 26-27.)  Kinnin also raises the "cat's paw" theory of liability, contending that

her termination was pretext to discrimination because the Pfadenhauer investigation was heavily influenced by Marcotte and that the report was simply "rubber-stamped" by West.  (*Id.* at 34-35.)  Additionally, Kinnin maintains that she was not a poor manager and that she had "a fine relationship with all employees except Marcotte and Briggs."  (*Id.* at 35.)  The court agrees that Kinnin has established her prima facie case but she has failed to demonstrate pretext.

Claims of gender-based discrimination are analyzed under the three-step *McDonnell Douglas* burden-shifting framework.  *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (2010)).  First, the plaintiff must establish a prima facie case of discrimination by demonstrating that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) [the adverse action occurred under] circumstances [that] give rise to an inference of discrimination."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802).

To show that the circumstances surrounding an adverse employment action give rise to an inference of discrimination, the plaintiff may point to,

among other things, the treatment of similarly situated employees outside of her protected class.  *See McGuinness v. Lincoln Hall*, 263 F.3d. 49, 54 (2d Cir. 2001) ("A showing that the employer treated a similarly situated employee differently is a common and especially effective method of establishing a prima facie case of discrimination.") (internal quotations and citations omitted).  The plaintiff is not required to show she was treated less favorably than an identically situated male employee; instead, she must show she was treated less favorably than a male employee who was similarly situated in all material aspects.  *See McGinness*, 263 F.3d at 54 (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).  Generally, whether employees are similarly situated is a question of fact for a jury, but the court "may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation . . . where no reasonable jury could find that the persons to whom the plaintiff compares [herself] are similarly situated."  *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citations omitted).

If the plaintiff establishes a prima facie case of discrimination, the employer must demonstrate a legitimate, non-discriminatory reason for the adverse employment decision.  *See McDonnell Douglas*, 411 U.S. at 802.

If the employer provides such a reason, the burden then shifts back to the employee to present evidence that her employer's proffered reason is a pretext for discrimination.  *See id.* at 804-05.  At this stage, the plaintiff must "show that [her] employer's proffered reasons . . . were not the only reasons [for her termination] and that [discrimination] was at least one of the motivating factors."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotation marks and citations omitted).

Under the "cat's paw" theory of liability, an employer may be liable for discrimination in an adverse employment decision against an employee where the ultimate decision maker is unbiased and has no discriminatory motives.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 416 (2011).  Under this theory, the unlawful motive of a non-decision maker is imputed to the decision maker, and employer, where the non-decision maker has some significant influence that leads to the adverse employment action.  *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d. Cir. 2016).  In order to impute liability on the decision maker for the discriminatory or retaliatory motive of another employee, the plaintiff must show that the decision maker acted negligently.  *See id.* at 275 ("Only when an employer in effect adopts an employee's unlawful animus by

12

acting negligently with respect to the information provided by the employee

. . . can the employee's motivation be imputed to the employer and used to

support a claim under Title VII.").

There appears to be no dispute that Kinnin satisfies the first three

elements required to make out a prima facie case for discrimination.  (Dkt.

No. 45, at 26 n.4.)  With respect to the fourth element, Kinnin has raised a

possible inference of discrimination in the circumstances surrounding her

termination.  (Dkt. No. 45 at 25-29.)  She has presented sufficient evidence

such that a reasonable jury could find that she was similarly situated to

Marcotte and treated less favorably than him.  (*Id.*)  Kinnin and Marcotte

were directors in Skidmore's IT Department and reported to Duffy, and

both Kinnin and Marcotte received complaints of discrimination against

them, which were investigated by Pfadenhauer.  (Def.'s SMF ¶¶ 6, 92, 97-

98.)  However, Kinnin was terminated at the conclusion of the investigation

while Marcotte was not.  (*Id.*  ¶¶ 112, 115.)  Accordingly, Kinnin has

satisfied the minimal requirements to state a prima facie claim for gender

discrimination.  *See McGuinness*, 263 F.3d at 54-55 (finding that plaintiff

established her prima facie case for discrimination by demonstrating that

she received less severance pay than a male employee with whom she

shared a "roughly equal rank").

While Kinnin has met her initial burden under the *McDonnell Douglas* framework for her discrimination claim, Skidmore has provided a non-discriminatory reason for Kinnin's termination.  (Def.'s SMF ¶ 114.)  Specifically, Kinnin was terminated because of poor management skills and poor performance.  *Id.; see Varno v. Canfield*, 664 F. App'x 63, 65 (2d Cir. 2016) (explaining that defendants established a legitimate justification by pointing to the fact that plaintiff was terminated for poor performance.)

Kinnin's claim fails because she has not presented sufficient evidence of pretext.  Kinnin has not pointed to any evidence to suggest that her gender was at least a motivating factor in West's decision to terminate her.  Kinnin attempts to show Skidmore's justification was pretextual by attacking the Pfadenhauer report, which Skidmore cites to as the basis for her termination.  (Dkt. No. 45 at 32-35.)  Specifically, Kinnin alleges that Brigg's complaint against her was made in bad faith, Pfadenhauer was not an independent party but rather heavily influenced by Marcotte and afforded preferential treatment to Marcotte during the investigation, Pfadenhauer "ignored information provided . . . if it did not support a conclusion that Kinnin was a poor manager," and the report was

14

simply "rubber-stamped" by West. (*Id*.)  Kinnin's speculative allegations,

without more, that Briggs' complaint was made in bad faith and that the

investigation was just a plot to get her fired are insufficient to defeat

summary judgment.  *See DiGirolamo v. MetLife Group, Inc.*, 494 F. App'x

120, 121-22 (2d. Cir. 2012) ("Mere conclusory allegations or

unsubstantiated speculation by the plaintiff will not defeat summary

judgment.").

Further, even if Kinnin's allegations that Briggs' complaint was filed in

bad faith, or that Marcotte and Briggs actually plotted to get Kinnin fired

because of her gender were true, Kinnin still cannot establish pretext under

the cat's paw theory.  Neither Briggs nor Marcotte had authority to fire

Kinnin, and she has not shown that Marcotte or Briggs played a meaningful

role in West's decision to terminate her, as they were each just one of

twenty-six people interviewed as a part of the investigation and were not

involved in any of the discussions West had regarding the conclusions in

the report.  *See Jones v. Target Corp.,* 792 F. App'x 54, 56-57 (2d Cir.

2019) (finding that, even if the subordinate employee who provided the

supervisor with the information that lead to plaintiff's termination had an

unlawful motive, the employer could not be found liable because the

plaintiff failed to show that the employee had any involvement in the

investigation and decision to terminate the plaintiff); (Def.'s SMF   ¶¶ 112-

13.)

An additional barrier to Kinnin's "cat's paw" theory is the fact that,

even if Briggs or Marcotte had a discriminatory animus against Kinnin, she

has not demonstrated that West, the decision maker in her termination,

acted negligently.  West did not blindly credit Briggs' complaint against

Kinnin, he relied on the report generated from Pfadenhauer's investigation,

which included interviews of twenty-six people and the review of over 200

documents.  (*Id.* ¶¶ 104, 112.)  West also conferred with Steffan and Duffy

before terminating Kinnin.  (*Id.*  ¶¶ 112-13.)  West testified that "[I]f [Duffy]

objected strenuously [to Kinnin's termination he] would have reconsidered"

his decision.  (Dkt. No. 45, Attach. 26 at 59-60.)  Here, there is no

evidence that West acted negligently in his decision to terminate Kinnin

based on the conclusions of Pfadenhauer.  *See Vasquez*, 835 F.3d at 276

("[A]n employer who, non-negligently and in good faith, relies on a . . .

report [recommending termination] cannot, under this "cat's paw" theory,

be held accountable.")  Thus, Kinnin has not established that Skidmore's

justification for her termination was pretext, because her assertions about

the legitimacy of the Pfadenhauer investigation are too speculative and not supported by the record, and Kinnin has not provided evidence to suggest West had an unlawful animus or was negligent in relying on the Pfadenhauer report in his decision to terminate her.  (Def.'s SMF ¶ 112.)

## B.    Title VII Retaliation

 Skidmore argues that, because Pfadenhauer was already retained to conduct an investigation into Briggs' complaint against Kinnin before Kinnin filed her complaint, and that she would have been terminated regardless of whether she filed a complaint based on the Pfadenhauer investigation, she cannot establish a causal connection between her protected activity and termination.  (Dkt. No. 41, Attach. 5, at 28-29.) Skidmore further contends that, even if Kinnin has established a prima facie case for retaliation, she cannot show that the justification for her termination for poor performance and management was pretext.  (*Id.* at 30-31.)

 Kinnin counters that she has established a causal connection between her protected activity and her termination because "HR understood from day one that [Kinnin] was complaining about discrimination against women," and, thus,  she was engaging in protected

17

activity before Briggs filed his complaint against her and Pfadenhauer was retained to investigate.  (Dkt. No. 45 at 31-32.)  Kinnin also asserts that there is direct evidence of retaliation because "Marcotte reacted angrily to Kinnin's [June 2017] email" and "accused Kinnin of insubordination, sought her investigation, and advocated for the termination of her employment."  (*Id.* at 33.)  Kinnin again raises the cat's paw theory of liability, contending that Skidmore's justification for her termination was pretext for retaliation because the Pfadenhauer investigation was influenced by Marcotte and that West merely "rubber-stamped" the report.  (*Id.* at 34.)  Additionally, Kinnin maintains her termination was pretext because she was not a poor manager and her relationships with all other employees, with the exception of Marcotte and Briggs, were "fine."  (*Id.* at 35.)

Title VII retaliation claims are evaluated under the same three-step burden shifting analysis as Title VII discrimination claims.  *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citations omitted); *see also McDonnell Douglas*, 411 U.S. at 802-05.  First, the plaintiff must establish a prima facie case of retaliation by showing that "(1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) [she]

suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012).  If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a non-retaliatory rationale for the adverse action.  *See Cox v. Onondaga Cnty. Sheriff's Dept.*, 760 F.3d 139, 145 (2d Cir. 2014).  "Once the employer has done so, the employee may prevail by demonstrating that the stated rationale is mere pretext" for retaliation.  *Id.*  To demonstrate pretext, the employee must show that retaliation was a "but for" cause of the adverse employment action.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346-47, 360 (2013).  In other words, Kinnin must show "that the adverse action would not have occurred in the absence of the retaliatory motive."  *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

Assuming without deciding that Kinnin satisfies the first three elements to establish her prima facie case for retaliation, with respect to the fourth element, Kinnin has presented sufficient evidence to establish that there was a causal connection between filing her formal complaint and her termination.  The undisputed facts support a causal connection

19

because Kinnin filed her complaint on May 30, 2018 and she was terminated on July 19, 2018, after the conclusion of Pfadenhauer's investigation, less than two months after filing her formal complaint of gender discrimination.  *See Simpson v. N.Y. State Dept. Of Civil Servs.*, 166 F. App'x 499, 502 (2d Cir. 2006) ("[T]he temporal proximity of . . . events gives rise to an inference of retaliation for the purposes of [establishing a] prima facie case."); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010); *Risco v. McHugh*, 868 F. Supp. 2d 75, 113 (S.D.N.Y. 2012) ("[T]he less than two-month temporal relationship between the protected activity and   . . . termination is sufficiently proximate to support an inference of causation.")  Therefore, Kinnin has established a prima facie case for retaliation.

Nonetheless, Skidmore has provided a non-retaliatory justification for Kinnin's termination.  As previously discussed, Kinnin was terminated on the grounds of poor performance and management skills, which is a legitimate justification for her termination.  *See supra* Part IV.A; *Varno*, 664 F. App'x. at 65.

Kinnin has failed to present sufficient evidence of pretext with respect to her retaliation claim.  Kinnin raises the same arguments to

rebut Skidmore's justification under her retaliation claim as she does regarding her discrimination claim. (Dkt. No. 45 at 34-35.) As previously discussed, Kinnin's speculative and conclusory allegations about the legitimacy of Briggs' complaint and the independence of the Pfadenhauer investigation, without more, are insufficient to defeat a motion for summary judgment. *See supra* Part IV.A. Additionally, Kinnin cannot show pretext for retaliation under the cat's paw theory of liability as she has not shown Marcotte, Briggs, or anyone with a retaliatory animus against her influenced West's decision to terminate her, nor has Kinnin demonstrated that West acted negligently in relying on Pfadenhauer's report. *See id*. Thus, for the reasons previously discussed, *see supra* Part IV.A, Kinnin has failed to show that her termination was pretext for retaliation.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Skidmore's motion for summary judgment (Dkt. No. 41) is **GRANTED**; and it is further

**ORDERED** that Skidmore's motion to preclude expert testimony (Dkt. No. 42) is **DENIED** as moot; and it is further

**ORDERED** that the complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk is directed to close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

August 1, 2022
Albany, New York

Gary L. Sharpe
U.S. District Judge